IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MELODY A. BAUCOM )
)
    Plaintiff, )
)
v. ) 1:06CV209
)
CABARRUS EYE CENTER, P.A. )
)
    Defendant. )

**MEMORANDUM OPINION AND ORDER**

OSTEEN, JR., DISTRICT JUDGE

    This matter is before the court on Motion for Summary Judgment (Doc. 49) filed by Defendant, Cabarrus Eye Center, P.A. For the reasons set forth herein, Defendant's motion for summary judgment will be denied.

**I.    Facts**

    The Plaintiff, Melody A. Baucom (hereinafter "Plaintiff" or "Ms. Baucom"), was employed by the Defendant, Cabarrus Eye Center, P.A. (hereinafter "Defendant" or "Cabarrus Eye"), as an optical assistant from July 8, 2002 until her termination on or about May 17, 2005. (Second Am. Compl. ¶ 4.) On February 28, 2006, Ms. Baucom filed suit against Cabarrus Eye, claiming that Cabarrus Eye wrongfully denied her request for leave for medical treatment, and terminated her for taking leave for which she was

entitled, all in violation of 29 U.S.C. §§ 2601 et seq., the Family Medical Leave Act (hereinafter "FMLA"). (Compl. ¶¶ 11, 29; Second Am. Compl. ¶ 32.) Cabarrus Eye contends that, consistent with its leave policies, Ms. Baucom's termination was lawful because she was not entitled to leave under the FMLA. (Def.'s Br. in Support of Mot. Summ. J. at 2-3, 11-16.) On June 30, 2008, Cabarrus Eye moved for summary judgment on Ms. Baucom's FMLA claim. (Def.'s Mot. Summ. J. at 1-4.)

### A. Defendant's Leave Policies

Cabarrus Eye maintained an employee handbook that set forth its Paid Time Off (hereinafter "PTO") and FMLA policies. (Bonnett Dep. Ex. 6 at 7-8.) Under Cabarrus Eye's PTO policy, employees were authorized to take paid time off for vacation, sick days, personal time, etc. (See id. at 8.) Ms. Baucom was allowed twenty days of PTO per year. (Bonnett Dep. at 31-34, 53.) Under Cabarrus Eye's FMLA policy, PTO time was charged concurrently with FMLA leave until all but five days of PTO were exhausted. (See Bonnett Dep. Ex. 6 at 8.)

### B. Plaintiff's Medical Treatment

From January 1, 2005 until March 14, 2005, Ms. Baucom took FMLA leave from Cabarrus Eye arising from her pregnancy. (Second Am. Compl. ¶ 9.) After returning from her pregnancy leave, Ms. Baucom sought medical treatment for various health issues that afflicted her. (Id. at 10-12, 25.)

On February 16, 2005, Ms. Baucom visited Dr. Jones, an obstetrician/gynecologist, after her regular obstetrician/gynecologist, Dr. Brittian Beaver, discovered abnormal cells in her cervix. (Beaver Dep. at 48-51.)[1] Dr. Jones conducted a Pap smear test on Ms. Baucom to screen for the presence of cervical cancer. (Id.) Dr. Jones found the results of the Pap smear to be abnormal and advised Ms. Baucom that she needed a colposcopy. (Id. at 51.)

On April 18, 2005, Dr. Beaver performed a colposcopy on Ms. Baucom. (Id. at 51-52.) After the colposcopy, Dr. Beaver decided to perform two biopsies and another Pap smear. (Id.) The second Pap smear "came back with atypical cells" and suggested that Ms. Baucom might have cancer. (Id. at 52.) Dr. Beaver recommended to Ms. Baucom that she undergo a LEEP procedure to remove any abnormal cells in her cervix and determine if the cells were in fact cancerous. (Id. at 52-57.)

On March 4, 2005, Dr. Gary Quigg, an internal medicine specialist that had been Ms. Baucom's physician since 1997, began treating Ms. Baucom for abdominal pain, pain defecating, and blood in her stool. (Quigg Dep. at 6-8, 31.) During a follow-up visit on April 14, 2005, Dr. Quigg examined Ms. Baucom and, suspecting that she suffered from irritable bowel syndrome, prescribed Ms. Baucom medicine to reduce the acid in her stomach.

---

[1] Dr. Jones's full name is not stated in Dr. Beaver's deposition transcript.

3

(Id. at 39-40.) Dr. Quigg also ordered blood work and had an ultrasound test performed to determine if Ms. Baucom had gallstones.[2] (Id. at 40.)

On April 18, 2005, per Dr. Quigg's instructions, Ms. Baucom underwent a gall bladder ejection fraction test to determine if her gall bladder was functioning properly. (Id. at 40-42.) On April 25, 2005, Dr. Quigg and Ms. Baucom met to discuss Ms. Baucom undergoing an abnormal liver function blood test. (Id. at 47.) At the conclusion of the April 25, 2005 meeting, Dr. Quigg referred Ms. Baucom to Dr. Fred Fowler, a gastroenterologist. (Id. at 52.)

Dr. Fowler treated Ms. Baucom on April 29, 2005. (Fowler Dep. at 21.) Dr. Fowler performed several blood tests, but was unable to identify the source of Ms. Baucom's ailments. (Id. at 33-34.) Consequently, Dr. Fowler determined he should perform a endoscopy and colonoscopy on Ms. Baucom. (Id. at 50-51.)

On May 17, 2005, Ms. Baucom once again visited Dr. Quigg. (Quigg Dep. at 56-57.) Ms. Baucom scheduled the meeting to obtain the results of tests that were conducted on her gall bladder. (Baucom Dep. at 44-45.) At the meeting, Dr. Quigg continued to suspect that Ms. Baucom's symptoms were related to irritable bowel syndrome, so he gave her an antispasmodic. (Quigg Dep. at 56-57.) Dr. Quigg also advised Ms. Baucom that he

---

[2] It is not clear from the record whether Dr. Quigg himself or another doctor performed the ultrasound test.

4

wanted her to undergo additional tests in hopes of successfully diagnosing and treating her ailments. (Id. at 60-61, 66.)

### C. Plaintiff's Request for Leave

Upon returning to work after her pregnancy, Ms. Baucom asked Clayton Bonnett, Cabarrus Eye's Practice Administrator, for a FMLA certification form so that she could formally request FMLA leave for health problems she was experiencing that were unrelated to her pregnancy. (Baucom Dep. at 79-80.) Ms. Baucom advised Mr. Bonnett that she had abnormal cells in her cervix that could be cancerous and needed to be removed. (Id. at 80, 82.) Mr. Bonnett responded to Ms. Baucom's request for a FMLA form by telling Ms. Baucom that she could only use her remaining FMLA leave for baby bonding or baby-related events. (Id. at 80.) He advised her that FMLA leave could only be used once a year and that such leave could not be used for her own health conditions. (Id.; Bonnett Dep. at 63-65.) A letter written from Mr. Bonnett to Ms. Baucom dated April 26, 2005 stated:

> Your current FMLA began on January 3, 2005. Therefore, you will be eligible for FMLA again on January 3, 2006. Please understand that there are certain situations that relate to the family-related event allowing for your current FMLA that would trigger you being able to take any unused FMLA time.
>
> Should situations not associated to the family-related event securing your FMLA arise requiring you to take additional time off, you would be required to take such time as Paid Time Off (PTO).

5

(Compl. Ex. 1.)  Mr. Bonnett told Ms. Baucom that there was "no point" in giving her the FMLA certification form because Cabarrus Eye would not grant her request for FMLA leave.  (Baucom Dep. at 135-36; Bonnett Dep. at 60.)

Despite Cabarrus Eye's refusal to give Ms. Baucom a FMLA certification form, Ms. Baucom obtained a certification form by printing a copy of the form from the internet.  (Baucom Dep. at 135-36.)  Dr. Fowler completed the form shortly thereafter.  (Id.; Fowler Dep. at 86-96; Fowler Dep. Ex. 3.)  The form indicated that Ms. Baucom suffered from a chronic serious health condition and needed intermittent leave from work because she was undergoing a continuing regimen of treatment.  (Fowler Dep. at 86-96; Fowler Dep. Ex. 3.)  Dr. Fowler believed that once or twice per month Ms. Baucom would need to be absent from work for one to two days.  (Fowler Dep. at 92-93; Fowler Dep. Ex. 3.)  Ms. Baucom then gave the completed form to Mr. Bonnett.  (Baucom Dep. at 135-36.)  Mr. Bonnett denied Ms. Baucom's formal request for FMLA leave in a letter dated May 5, 2005.  (Id.; Bonnett Dep. Ex. 18.)  On May 16, 2005, Ms. Baucom was told that she would be terminated if she went to her doctor's appointment on May 17, 2005.  (Baucom Dep. at 44.)  Ms. Baucom nevertheless attended her doctor's appointment on May 17, 2005.  (Id. at 52.)  On or about that same day, Cabarrus Eye terminated Ms. Baucom's employment, contending that Ms. Baucom did not have any PTO time left to

6

cover her absence and was not entitled to FMLA leave. (Id. at 89; Bonnett Dep. at 65; Bodder Dep. at 38-39.)[3]

## II. The Legal Standard

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that no genuine issues of material facts exist, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the moving party has met that burden, then the nonmoving party must persuade the court that a genuine issue remains for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56) (citations and footnote omitted).

In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The court must view the facts in

---

[3] "Bodder" refers to Joel Bodder. Mr. Bodder is the Optical Manager at Cabarrus Eye. (Bodder Dep. at 13.)

7

the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable. <u>Id.</u> at 255. However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine. Fed. R. Civ. P. 56(c); <u>Anderson</u>, 477 U.S. at 248. A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

### III. Discussion

Cabarrus Eye argues that its motion for summary judgment should be granted because there are no genuine issues of material fact as to (1) whether Ms. Baucom suffered from a "serious health condition" so as to entitle her to leave under the FMLA, (2) whether Ms. Baucom's May 17, 2005 doctor visit qualified as intermittent FMLA leave, and (3) the adequacy of Ms. Baucom's FMLA certification. (Def.'s Br. in Support of Mot. Summ. J. 11-16.)

#### A. Serious Health Condition

Under the FMLA, an eligible employee is entitled to twelve weeks of unpaid leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(1)(D). A "serious health condition" is defined, in

8

part, as "an illness, injury, impairment, or physical or mental condition that involves":

> (2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes <u>any one or more of the following</u>:
>> (i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>>
>> . . . .
>>
>> (iii) <u>Any period of incapacity</u> or <u>treatment for such incapacity</u> due to a chronic serious health condition. A chronic serious health condition is one which:
>>> (A) <u>Requires periodic visits for treatment</u> by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;
>>> (B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
>>> (C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 852.114(a) (emphasis added). Further, "[t]reatment for purposes of paragraph (a) of this section includes (but is not limited to) <u>examinations to determine if a serious health condition exists</u> and evaluations of the condition." 29 C.F.R. § 852.114(b) (emphasis added).

9

Here, Cabarrus Eye argues that summary judgment should be granted in its favor because there is no evidence that Ms. Baucom was incapacitated for at least three calendar days. Cabarrus Eye asserts that the "regulations are clear that, absent inpatient care, an employee must have suffered a period of incapacity of 'more than three consecutive calendar days' to qualify as suffering from a serious health condition." (Def.'s Br. in Support of Mot. Summ. J. at 11, 15-16) (quoting <u>Rodriguez v. Smithfield Packing Co.</u>, 545 F.Supp.2d. 508, 521 (D. Md. 2008)(quotation marks omitted in original)).

This court finds that, in light of the fact that Ms. Baucom is bringing her claim under 29 C.F.R. § 852.114(a)(2)(iii), Ms. Baucom need not offer evidence that she was incapacitated for three or more days. Cabarrus Eye's assertion is overly broad and inconsistent with a plain reading of 29 C.F.R. § 852.114(a)(2).

29 C.F.R. § 852.114(a)(2) provides five bases for an employee to contend that she suffered from a serious health condition that required continuing treatment. Clearly these bases are alternatives to each another. Subsection (a)(2) states that "[a] serious health condition involving continuing treatment by a health care provider includes <u>any one or more</u> of the following." <u>Id.</u> (emphasis added). Only subsection (a)(2)(i) makes reference to a regulatory threshold period of incapacity. <u>Id.</u> The subsection Ms. Baucom is proceeding under, subsection

10

Case 1:06-cv-00209-WO-RAE   Document 77   Filed 12/10/08   Page 10 of 16

(a)(2)(iii), like subsections (ii), (iv), and (v), does not contain such a regulatory threshold period.[4] Id.; (Pl's Mem. Law Opp'n Def.'s Mot. J. at 12.) Ms. Baucom only needed to offer evidence that she was incapacitated for "any period" or was seeking treatment for "any period" of incapacity; she has done just that.

Ms. Baucom testified that she told Mr. Bonnett that she scheduled her appointment with Dr. Quigg on May 17, 2005 to have a test done to determine whether the abnormal cells her doctor discovered in her cervix were cancerous. (Baucom Dep. at 82.) She also testified that she visited Dr. Quigg on May 17, 2005 to obtain test results on her gall bladder and was advised at that meeting that Dr. Quigg wanted her to undergo more tests. (Id. at 44-45, 52-53.) Further, Dr. Quigg testified that at the May 17, 2005 meeting he suspected that Ms. Baucom suffered from irritable bowel syndrome, so he gave her an antispasmodic. (Dr. Quigg Dep. at 56-57.) He also testified that he believed that the abdominal pain that Ms. Baucom reported during her doctor visits on March 4, April 14, April 25, and May 17, 2005 were

---

[4] This court's interpretation of 29 C.F.R. §§ 852.114(a)(2)(iii) and (b) is consistent with the apparent understanding of other federal courts. See Gladden v. Winston Salem State Univ., 495 F.Supp. 2d 517, 521 (M.D.N.C. 2007) ("A 'serious health condition' is defined, in part, as an illness or impairment that requires continuing treatment by a health care provider . . . and that also involves a period of incapacity requiring absence from work for more than three calendar days.") (emphasis added and internal citations omitted); Rask v. Fresenius Med. Care N. Am., 509 F.3d 466, 472 (8th Cir. 2008) ("The relevant regulations list several categories of serious health conditions involving continuing treatment, but it appears to us that only one could possibly apply to [the employee in this case.]") (emphasis added).

11

related. (Id. at 60-61.) He testified that Ms. Baucom's visits were a part of ongoing treatment of Ms. Baucom and an attempt to diagnose Ms. Baucom's ailments. (Id. at 66.) With regard to Ms. Baucom's incapacitation, Dr. Quigg suggested that although he did not think Ms. Baucom suffered from a "crippling" condition, her ailments could have caused her to be incapacitated. (Id. at 63) ("I don't think she had anything serious or potentially crippling . . . . But nonetheless, there are times in a person's life when symptoms can certainly be more disabling than the severity of their cause might indicate.")

The aforementioned testimony taken together, drawing all reasonable inferences in favor of Ms. Baucom, constitutes sufficient evidence from which a reasonable juror could find that Ms. Baucom had a chronic serious health condition and was entitled to leave under the FMLA.[5] Accordingly, Cabarrus Eye's motion for summary judgment on the ground that there is no genuine issue of material fact as to whether Ms. Baucom suffered from a "serious health condition" is denied.[6]

---

[5] Pursuant to 29 C.F.R. §§ 852.114(a)(2)(iii) and (b).

[6] As evidence that Ms. Baucom did not suffer from a serious health condition, Cabarrus Eye cites Dr. Quigg's testimony that he did not initially know why Ms. Baucom made an appointment with him on May 17, 2005. (Def.'s Br. in Support of Mot. Summ. J. at 12.) The court notes that the fact that Dr. Quigg did not know why Ms. Baucom planned to visit him does not necessarily mean Ms. Baucom did not in fact schedule the examination "to determine if a serious health condition exist[ed] and [to evaluate] the condition," as permitted by the FMLA. See 29 C.F.R. § 852.114(b) (defining the term "treatment").

12

## B. Intermittent FMLA Leave

Under the FMLA, leave may be taken "intermittently or on a reduced schedule" "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. §§ 2612(b)(1) and (a)(1)(D).[7] "Intermittent leave may be taken for a serious health condition which requires treatment by a health care provider periodically, rather than for one continuous period of time, and may include leave periods from an hour or more to several weeks." 29 C.F.R. § 825.203(c)(1). In the case of a foreseeable or planned medical treatment, the employee "shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer" and provide the employer with at least thirty days notice before the date of leave is to begin unless such prior notice is not practicable. 29 U.S.C. § 2612(e)(2).

In the present case, Cabarrus Eye argues that its motion for summary judgment should be granted because "Plaintiff has made no showing that there was anything medically necessary requiring her to miss work on [May 17, 2005,] and that she could not have scheduled the appointment at another time or that she could not

---

[7] "Intermittent leave is FMLA leave taken in separate blocks of time due to a single qualifying reason. A reduced leave schedule is a leave schedule that reduces an employee's usual number of working hours per week, or hours per day." 29 C.F.R. § 825.203(a).

have obtained the information via telephone." (Def.'s Br. in Support of Mot. Summ. J. at 13.) This court finds that Ms. Baucom has made a sufficient showing that there is a genuine issue of material fact as to her entitlement to intermittent FMLA leave. Cabarrus Eye's motion for summary judgment with regard to this issue is denied.

First, as previously discussed, a reasonable jury could conclude that Ms. Baucom's May 17, 2005 visit with Dr. Quigg was "medically necessary" (i.e., that Ms. Baucom suffered from a chronic serious health condition under 29 C.F.R. §§ 852.114(a)(2)(iii) and (b)). Further, Ms. Baucom has made a showing that she could not have scheduled the appointment at another time, so as not to interfere with Cabarrus Eye's business operations. Ms. Baucom explicitly testified that "[i]t was my understanding that if I took the time off on May 17, I would be terminated" and "[a]ny time that I [could have] [re]scheduled, [the appointment with Dr. Quigg] would have been on company time, so there was no way around that." (Baucom Dep. at 52.) Lastly, there is evidence to suggest that Ms. Baucom gave Cabarrus Eye at least thirty days notice of her intent to take leave on May 17, 2005. Ms. Baucom testified that she submitted an FMLA certification application to Cabarrus Eye in April 2005 regarding her request for leave in May 2005. (Id. at 50.)

14

## C. FMLA Certification

Under the FMLA, "[a]n employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a). "At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification." 29 C.F.R. § 825.305(d). Failure to do so constitutes a violation of the employee's rights under the FMLA. McDougal v. Altec Indus., Inc., 553 F.Supp.2d 862, 870 (W.D. Ky. 2008).

Further, "[t]he employer shall advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any such deficiency." 29 C.F.R. § 825.305(d). If the employer does not provide the employee a reasonable opportunity to cure deficiencies in the employee's certification, the employer may not prevail on its claim that the employee's FMLA certification was inadequate. See Miller v. AT&T Corp., 250 F.3d 820, 836 (4th Cir. 2008) (finding that the employer's failure to provide the employee with a reasonable opportunity to cure his FMLA certification deficiency served as alternative basis for the court's rejection of the employer's insufficient certification argument).

15

Here, Cabarrus Eye maintains that its motion for summary judgment should be granted because no reasonable juror could find that Ms. Baucom's FMLA certification was sufficient under 29 C.F.R. § 2613; this court disagrees. Cabarrus' Eye motion for summary judgment with regard to Ms. Baucom's fulfillment of the FMLA's certification requirement is denied. The court finds that a genuine issue of material fact exists.

There is nothing to suggest that Cabarrus Eye fulfilled the certification requirements imposed upon employers under 29 C.F.R. § 825.305(d). The record is devoid of evidence that Cabarrus Eye informed Ms. Baucom of any deficiencies in the FMLA certification form she submitted to Mr. Bonnett. Absent such evidence, Cabarrus Eye may not successfully rely on the argument that Ms. Baucom's certification was insufficient.

**IV. Conclusion**

For the reasons set forth above, Defendant's motion for summary judgment is DENIED.

This the 10th day of December 2008.

                         _William L. Osteen, Jr._
                         United States District Judge